**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| KAREN CAMPBELL, ) | CASE NO. 1:09-cv-1394 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | MAGISTRATE JUDGE VECCHIARELLI |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | **MEMORANDUM OPINION & ORDER** |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff, Karen Campbell ("Campbell"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Campbell's application for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 416 (i).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED and REMANDED.

### I. Procedural History

Campbell filed her application for DIB on November 9, 2005 alleging disability beginning April 8, 2005.  Her application was denied initially and upon reconsideration.  Campbell timely requested an administrative hearing.

Administrative Law Judge ("ALJ"), Judith M. Stolfo, held a hearing on June 9, 2008, at which Campbell, who was represented by counsel, and Jeff R. Blank, vocational expert ("VE") testified.  The ALJ issued a decision on September 4, 2008, in which she determined that Campbell was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.  Campbell filed an appeal to this Court.

On appeal, Campbell claims the ALJ erred by:  (1) failing to grant appropriate weight to the opinions of Campbell's treating physicians; (2) improperly assessing Campbell's impairments under Listings 12.03, 12.04, and 12.06; and (3) erroneously relying on the vocational expert's testimony.  The Commissioner disputes these claims.

### II. Evidence

#### A. Personal and Vocational Evidence

Campbell was born on November 20, 1960.  (Transcript ("Tr.") 433).  She was 47 years old at the time of her hearing.  She completed the eighth grade and has a GED.  (Tr. 438-439).  Campbell has past relevant work as a hydraulic tester, which is classified as medium and skilled.  (Tr. 456).

#### B. Medical Evidence

Campbell began treating with psychiatrist Rakesh Ranjan, M.D. for mental health

issues in 2000. (Tr. 448). She began treating with psychologist Steven Davis, Ph. D. In August 2004. (Tr. 338).

On June 7, 2005, Dr. Ranjan completed an agency questionnaire. Dr. Ranjan stated that Campbell had paranoid thoughts, depressed mood, liable affect, hopelessness, helplessness, and anxious thoughts. She had poor/impaired concentration and lacked frustration tolerance. Dr. Ranjan stated that Campbell had difficulty getting out of bed and could not complete daily functions due to her symptoms. He described poor social functioning and frequent, severe, and continued episodes of decompensation. He stated that Campbell had been unresponsive to treatment, and that she required further medication adjustment and therapy. Dr. Ranjan diagnosed panic disorder without agoraphobia and major depression. (Tr. 287-289).

On August 25, 2005, state agency reviewing psychologist Patricia Semmelman completed a psychiatric review technique. (Tr. 295-308). Dr Semmelman opined that Campbell had: (1) mild restrictions in activities of daily living; (2) moderate difficulties in maintaining social functioning; and (3) moderate difficulties maintaining concentration, persistence, and pace. (Tr. 305). Dr. Semmelman diagnosed major depression and panic disorder without agoraphobia. (Tr. 298, 300).

Also on August 25, 2005, Dr. Semmelman completed a mental residual functional capacity report. (Tr. 291- 294). Dr. Semmelman opined that Campbell was moderately limited in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) work in coordination with or proximity to others without being distracted by them; (5) complete a normal workday and workweek without interruptions from psychologically

3

based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (7) respond appropriately to changes in the work setting.  (Tr. 291-292).

On September 6, 2005, Campbell presented to Dr. Davis.  She reported increased appetite, paranoid thoughts, and depressed mood.  (Tr. 224).

On October 14, 2005, Campbell presented to Dr. Davis for follow up.  Campbell reported that she had good days and bad days.  On bad days, which occurred about twice a week, Campbell stayed in bed.  On good days she went outside and gardened. (Tr. 222).

On November 9, 2005, Dr. Ranjan wrote a letter in which he stated that Campbell was under his care for panic disorder without agoraphobia and severe major depression.  Dr. Ranjan stated that he sees Campbell biweekly for medication management and that, in his opinion, Campbell would be off work for a year and may be unable to return to work thereafter.  (Tr. 290).

On November 10, 2005, Dr. Ranjan completed a long term disability claim form.  Dr. Ranjan indicated  that Campbell was very depressed and paranoid.  He stated that she is socially isolated and is unable to function normally in society.  Her ability to concentrate is poor, and she cannot tolerate any stress.  Dr. Ranjan stated that Campbell's symptoms have escalated due to personal stress and her medications are not working well.  He opined that Campbell would not be able to return to work until her paranoid symptoms were controllable.  (Tr. 309-310).

Campbell presented to Dr. Davis for follow up on November 13, 2005; December

20, 2005; and January 10, 2006.  Dr. Davis noted that Campbell had suicidal ideation, auditory hallucinations, depression, and  paranoia.  (Tr. 216, 218, 220).

In early 2006, Dr. Ranjan completed an agency questionnaire.  Dr. Ranjan described Campbell as having flat affect, severe depressed mood, and paranoid thought content.  He opined that Campbell had moderately impaired memory, concentration, reasoning, judgment, and insight.  He stated that these impairments together with her paranoid thoughts interfere greatly with her daily activities.  Campbell is unable to interact appropriately with coworkers and supervisors due to paranoid thoughts and depressive symptoms.  She is unable to tolerate stress.  She experiences depressive symptoms approximately four times a week accompanied by paranoid thoughts and irritability.  Campbell remains in bed at least twice a week due to the severity of her depressive symptoms.  Dr.  Ranjan stated that Campbell had been experiencing symptoms of depression for approximately 11 years.  He stated that Campbell's medications have been adjusted as necessary, but despite ongoing individual psychotherapy and medication treatment, her symptoms persist, although in a less severe form.  Dr. Ranjan diagnosed severe recurrent major depression without psychotic features.  (Tr. 314-316).

On February 1, 2006, state agency reviewing psychologist Nancy McCarthy completed a psychiatric review technique.  Dr. McCarthy diagnosed major depression and panic disorder without agoraphobia.  (Tr. 320, 322).  Dr. McCarthy opined that Campbell had mild restrictions in activities of daily living and had moderate difficulties in maintaining social functioning and maintaining concentration, persistence, and pace. (Tr. 327).

5

Also on February 1, 2006, Dr. McCarthy completed a mental residual functional capacity assessment.  Dr. McCarthy opined that Campbell was moderately limited in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) work in coordination with or proximity to others without being distracted by them; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (7) respond appropriately to changes in the work setting.  (Tr. 332-333).

On April 11, 2006, Dr. Davis completed a medical source statement.  Dr. Davis opined that Campbell had fair ability to follow work rules and poor or no ability[1] to: (1) use judgment; (2) maintain attention and concentration for extended periods of 2 hour segments; (3) respond appropriately to changes in routine setting; (4) maintain regular attendance and be punctual within customary tolerances; (5) deal with the public; (6) relate to co-workers; (7) interact with supervisors; (8) function independently without special supervision; (9) work in coordination with or proximity to others without being unduly distracted or distracting; (10) deal with work stresses; (11) complete a normal workday and workweek without interruptions from psychologically based symptoms and

---

[1]Campbell argues that Dr. Davis's opinion supports the conclusion that she suffers from marked limitations.  A marked limitation is, "more than moderate but less than extreme.  A marked limitation may arise when several activities or functions are impaired, or when only one is impaired, so long as the degree of limitation is such as to interfere seriously with [claimant's] ability to function independently, appropriately, effectively on a sustained basis."  20 CFR Pt 404, Subpart P, App. 1.  It would appear that Dr. Davis's findings of "poor or no ability" fall within the definition of marked.

6

perform at a consistent pace without an unreasonable number and length of rest periods; (12) understand, remember, and carry out complex job instructions; (13) understand, remember, and carry out detailed, but not complex job instructions; (14) understand, remember, and carry out simple job instructions; (15) maintain appearance; (16) socialize; (17) behave in an emotionally stable manner; (18) relate predictably in social situations; and (19) manage funds/schedules.  Dr. Davis noted that Campbell does not like to travel alone and is accompanied to her appointments.  Dr. Davis diagnosed schizophrenia with paranoid and obsessive compulsive features.  (Tr. 336-337).

Also on April 11, 2006, Dr. Davis completed a request for information submitted by the state agency.  Dr. Davis stated that Campbell had a flat affect and was paranoid.  She has low average intelligence, poor ability to concentrate, and a low tolerance for frustration.  She cannot tolerate stress and will deteriorate quickly under minimal stress.  Campbell has had symptoms since 1995.  Her symptoms interfere with her life on a daily basis.  She is compliant with medication and appointments but sometimes her compliance fluctuates; she is unable to make appointments at times due to her panic attacks.  She has had a fair response to treatment.  Dr. Davis diagnosed panic disorder and major depression, recurrent.  (Tr. 338-340).

On May 12, 2006, Dr. Ranjan wrote a letter to the state agency in which he indicated that Campbell continued to be under his care for depression.  He noted that Campbell was compliant with her medication and appointments and there had been no significant changes since his last report. (Tr. 342).

Campbell presented to Dr. Davis on June 1, 2006.  Dr. Davis noted that Campbell

7

had experienced a 30 pound weight gain over 60 days due to her medication.  She also had increased depression, suicidal ideation, feelings of hopelessness and helplessness, paranoia, and racing thoughts.  (Tr. 425-426).

On July 27, 2006, Campbell presented to Dr. Davis.  She reported auditory hallucinations and suicidal ideation.  She also reported weight gain and sexual changes as a result of her medication.  (Tr. 423).

On August 30, 2006, Campbell presented to Dr. Ranjan complaining of auditory hallucinations.  Dr. Ranjan described Campbell's mood as depressed and apathetic.  (Tr.  421).

On September 28, 2006, Campbell presented to Dr. Ranjan.  She reported decreased racing thoughts, decreased auditory hallucinations, good appetite and sleep, increased crying spells, worries, and feeling fearful.  Her mood was sad and her affect dull.  She reported that her medications made her feel spacey and tired.  (Tr. 419).

On November 16, 2006, Campbell presented to Dr. Ranjan complaining of depression, feelings of hopelessness and helplessness, guilt, and crying spells.  Dr. Ranjan noted increased auditory hallucinations, paranoia, and increased racing thoughts.  He also noted depressed mood, flat affect, and poor concentration and memory.  (Tr. 417).

On December 28, 2006, Campbell presented to Dr. Ranjan complaining of increase mood swings, increased depression, and increased feelings of hopelessness and helplessness.  Dr. Ranjan noted slightly depressed mood and flat affect, and fair memory and concentration.  (Tr. 415).

On May 6, 2007, Campbell presented to Dr. Ranjan.  She reported that she was

8

feeling pretty good.  She also reported having a panic attack over the cost of car repairs.  Dr. Ranjan noted depressed mood and apathetic affect.  He also noted an increase in suicidal ideation.  (Tr. 193).

On May 23, 2007, Campbell presented to Dr. Ranjan.  Her mood was neutral and her affect was calm.  Dr. Ranjan noted that Campbell's mood was improving slowly.  He also noted that Campbell refused counseling at that time.  (Tr. 192).

On September 26, 2007, Campbell presented to Dr. Ranjan.  He noted that Campbell had severe depressive symptoms, severe mood swings, moderate anxiety, panic attacks, severe irritability, moderate racing thoughts, increased energy, severely impaired concentration and moderately impaired interests.  Campbell's husband reported that she was taking 20 mg. of Lexopro rather than 30 mg. because she was afraid she would run out of the medication.  (Tr. 395).  Dr. Ranjan reported that Campbell was compliant with her medication, treatment and appointments.  He assessed a GAF score of 65.[2]  (Tr. 179).

On October 10, 2007, Campbell presented to Dr. Ranjan.  He noted that Campbell had severe depressive symptoms, severe mood swings, severe anxiety, panic attacks, severe irritability, severe racing thoughts, severe decrease in energy and interests, severely impaired concentration, disheveled appearance, depressed mood, and flat affect.  (Tr. 391-392).  Dr. Ranjan noted that Campbell's condition was

---

[2]A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

9

deteriorating and he assigned a GAF score of 60[3]. He noted that Campbell had not been taking her Lexopro as prescribed. He also noted that Campbell had not seen a counselor since August 15, 2006 because she could not afford the gas to get to counseling. (Tr. 175).

On June 15, 2008, Campbell presented to Dr. Ranjan. Dr. Ranjan noted that Campbell had severe depressive symptoms, moderate mood swings, moderate anxiety, panic attacks, severe irritability, severe racing thoughts, mild insomnia, unusual thoughts, auditory hallucinations, intrusive thoughts, and infrequent suicidal ideation. Campbell's appearance was unkempt and she was preoccupied. Her mood was depressed and her affect was flat. (Tr. 363-364).

On June 10, 2008, Drs. Davis and Ranjan sent a letter to Campbell's attorney in which they indicated that Campbell had been a patient since 2000, but that in recent months she had not been able to schedule regular appointments for a variety of reasons including rising gasoline costs and the distance to the office from her home. They also noted that Campbell suffered from phobias that prevented her from driving alone to her appointments. (Tr. 433).

On October 21, 2008, Dr. Davis wrote a letter to Campbell's attorney in which he stated that Campbell reported that she is unable to do laundry, she does not mow the lawn, and she is unable to drive due to her anxiety/panic disorder. She is unable to

---

[3]A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

10

handle her savings account and her husband pays bills for her.  Dr. Davis concluded that it continues to be his professional opinion that Campbell is emotionally and mentally unable to sustain gainful employment. (Tr. 433A).

### C. Hearing Testimony

Campbell testified that she had been treated for depression since 2000.  She was able to work for five years after she began treatment, but she stopped working in 2005 because she thought people were making fun of her and were out to get her, and because she could not take the noise.  (Tr. 447-448).

Campbell testified that she treated with Dr. Ranjan, whose office was approximately 30 miles away, approximately once a month.  She went to appointments with her mother or mother-in-law.  She could not go unless she had someone to take her.  (Tr. 439-440, 447).  Campbell was wiling to look for a psychiatrist closer to her home, but she had not done so yet because she was concerned it might, "mess something up" if she switched doctors.  (Tr. 444).  Campbell stopped seeing her counselor approximately six months before the hearing because she could not afford to see him.  (Tr. 439).

Campbell lives with her husband and her 17 year old son.  (Tr. 440-441, 446). Campbell spends her days in bed or sitting in a chair watching the weather channel. (Tr. 444, 447, 449-450).  Approximately three days a week she remains in bed.  (Tr. 450).  She does not do the laundry or go shopping alone.  (Tr. 445).  Her husband orders takeout food for dinner.  (Tr. 455).

Campbell testified that she does not like to go outside because she does not want her neighbors to see her.  (Tr. 444).  However, some days she is able to go outside to

sit or walk with her son. (Tr. 450). She testified that she is able to do this when "her head would let her". (Tr. 450).

Campbell testified that she hears a voice in her head that tells her not to do things, like not to get up or not to go outside. Sometimes the voice tells her to give up. (Tr. 442-443). The only time she does not hear the voice is when she is sleeping. (Tr. 454).

The ALJ asked the VE to consider an individual of the same age, education, and past work experience as Campbell who had no physical limitations but who was moderately limited in his ability: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration; (4) work in coordination with or proximately to others; (5) complete a normal workday and workweek; (6) perform at a consistent pace; (7) get along with coworkers and peers; and (8) respond appropriately to changes in the work place. (Tr. 456). The VE testified that such an individual could not do Campbell's past work. (Tr. 457). However, such an individual could work as a dishwasher, for which there are 1,000,000 jobs nationally and 8,000 jobs in Ohio, or as a carwash attendant, for which there are 400,000 jobs nationally and 1,500 jobs in Ohio. (Tr. 457).

In response to questioning by Campbell's attorney, the VE testified that if an individual were to miss work more than two days per month due to psychiatric interference, the individual would be able to sustain competitive employment.

### III. Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health &*

12

*Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. § 416.1100 and 20 C.F.R. § 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. § 404.1520(d) and 20 C.F.R. §416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV. Summary of Commissioner's Decision

The ALJ made the following findings:

> 1. The claimant meets the insured status requirements of the

13

Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since April 8, 2005, the alleged onset date (20 CFR 404.1520(b) and 404.1571 et seq.).

3. The claimant has the following severe impairments: an affective disorder and an anxiety disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations. She has moderate limitations in her ability to: understand, remember and carryout detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number or length of rest periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on November 20, 1960 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart 4, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers

>        in the national economy that the claimant can perform (20 CFR
>        404.1560(c) and 404.1566).
>
>        11. The claimant has not been under a disability, as defined in the Social
>        Security Act, from April 8, 2005 through the date of this decision (20 CFR
>        404.1520(g)).

(Tr. 17-19, 22-23).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  See *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Campbell alleges that the ALJ erred by: (1) failing to grant appropriate weight to the opinions of Campbell's treating physicians; (2) improperly assessing Campbell's impairments under Listings 12.03, 12.04, and 12.06; and (3) erroneously relying on the vocational experts testimony that was based on an inadequate hypothetical question. The Commissioner disputes these claims.

15

### A. Treatment of Medical Opinions

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner. *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983). Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2). This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services,* 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services,* 865 F.2d 709, 711-12 (6th Cir. 1988). Where there is insufficient objective data supporting the treating physician's opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the fact finder may choose to disregard the treating physician's opinion. *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986). The fact finder must, however, articulate a reason for not according the opinions of a treating physician controlling weight. *Shelman v. Heckler,* 821 F.2d 316 (6th Cir. 1987).

Even when a treating physician's opinion is found not to be entitled to controlling weight, it is still entitled to deference:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled

> to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *4.

When the adjudicator determines that the treating source's opinion is not entitled to controlling weight, he is required to articulate good reasons for the weight given to the treating source's medical opinion.  20 C.F.R. §§ 404.1527(d) (2) and 416.927.

> [T]he ...decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *5.

In the instant case, the ALJ's only purported reason for rejecting the treating physicians' opinions is erroneous.  The ALJ states that, "Dr. Ranjan's reports were not consistent with Dr. Davis' report regarding the claimant's Global Assessment of Functioning in the 60 [sic] and 70's.  The findings of Dr. Davis were more consistent with the claimant's overall functioning".  (Tr. 21).  In support of this finding, the ALJ cites Dr. McCarthy's mental residual functional capacity assessment.  (Tr. 21, 332-335).  However, contrary to the ALJ's finding, this assessment does not contain any evidence regarding any GAF scores assessed by Dr. Davis.  Rather, Dr. McCarthy states that when Campbell sees her psychologist, Campbell rates her happiness in the 60's or 70's out of 100.  (Tr. 334).  Moreover, Dr. McCarthy's conclusion, which the ALJ adopted, that Dr. Davis's findings were more consistent with Campbell's overall functioning is not supported by any evidence.  In fact, Dr. Ranjan's and Dr. Davis's opinions are very

17

consistent and the ALJ has not provided any justification for rejecting them.[4]

The Commissioner, in his brief, attempts to justify the ALJ's rejection of the treating physicians' opinions; however, such a recitation is purely conjecture upon the part of counsel and cannot serve as the basis for review by a court. *See Watford v. Massanari*, No. 1:00 CV 00004, p. 13 (N.D. Ohio April 24, 2001); *see also National Labor Relations Board v. Kentucky River Community Care, Inc.*, 532 U.S. 706, 715 n.1

---

[4] The ALJ also states, in cursory fashion, that her opinion is based upon the fact that Campbell, "is not always compliant with treatment due to her inability to travel to her doctor. However, she has not requested information for a possible doctor and therapist closer to her home." Additionally, the ALJ found that Campbell told her treating physician that she does not want to return to work. (Tr. 21-22). The ALJ's statements are somewhat misleading. Campbell and her doctors explained that Campbell was sometimes unable to travel to appointments for a variety of reasons including the cost, and her inability to travel alone due to her phobias. The ALJ recognized that Campbell suffered from paranoia but indicated that Campbell's paranoia should motivate her to seek treatment rather than impair her from seeking it. Thus, the ALJ stated, " I understand that you have problems with paranoia but that's one of the reasons you need to see the psychiatrist and be in treatment and going to see them every couple of months is not significant treatment given the severity of the symptoms you're talking about. It's–do you not want to get better?" (Tr. 443). The ALJ then asked Campbell whether she considered finding a doctor closer to home. Campbell replied that she was open to finding a doctor closer to home, but she had not done so yet because she was afraid it would, "mess something up if I switched doctors in the middle of all this." (Tr. 443-444). While the ALJ may have thought that Campbell should have made a greater effort to see her doctors on a more frequent basis, "it is questionable practice to chastise one with mental impairments for the exercise of poor judgment in seeking rehabilitation." *Blakenship v. Bowen,* 874, F.2d 1116, 1124 (6th Cir. 1989).

Additionally, the ALJ's finding that Campbell did not want to return to work is also misleading. The ALJ found that on June 7, 2007, Campbell reported that, although her symptoms had stabilized, she did not want to return to work. (Tr. 20, 189). First, although Campbell's symptoms may have stabilized, she was still experiencing them. Moreover, the ALJ did not include the entire relevant portion or the record which states, "Patient reports feeling different, doesn't feel she can go back to work. Has been on disability for three years. Says she doesn't want to go back to work." (Tr. 189). Read in context, Campbell's statement suggests that she did not want to go back to work because she did not feel that she was well enough to go back to work. Further, it appears the ALJ inappropriately cherry picked this statement out of hundreds of pages of medical records.

18

(2001) (counsel's *post hoc* rationalizations are not substituted for the reasons supplied by the administration); *Securities and Exchange Comm'n v. Federal Water & Gas Corp.*, 332 U.S. 194, 196 (1947) ("a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."); *Municipal Resale Serv. Customers v. Federal Energy Regulatory Comm'n*, 43 F.3d 1046, 1052 (6th Cir. 1995) (same); *Amoco Prod. Co. v. National Labor Relations Bd.*, 613 F.2d 107, 111 (5th Cir. 1980) (same and citing cases); *Sparks v. Bowen*, 807 F.2d 616, 617 (7th Cir. 1986) (in social security review, court must evaluate the reasons set forth by the ALJ).

The ALJ's failure to fully articulate her reasons for rejecting the treating physicians' opinions deprives this Court of the ability to conduct any meaningful review. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("we cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544-546 (6th Cir. 2004) (finding it was not harmless error for the ALJ to fail to make sufficiently clear why he rejected the treating physician's opinion, even if substantial evidence not mentioned by the ALJ may have existed to support the ultimate decision to reject the treating physician's opinion). Therefore, her opinion must be vacated.

### B. Assessment of Campbell's impairments Under The Listings

Campbell alleges that the ALJ improperly assessed Campbell's impairments under Listings 12.03, 12.04, and 12.06. Resolution of this issue is dependent upon the

weight given to the treating physicians' opinions upon remand.  Therefore, the ALJ shall reconsider this issue upon remand.

### C. The ALJ's Step Five Analysis

Campbell also alleges that the ALJ erroneously relied on the VE's testimony because the hypothetical question upon which his testimony was based failed to include all of Campbell's impairments.  Resolution of this issue is likewise dependent upon the weight given to the treating physicians' opinions upon remand.  Therefore, the ALJ shall also reconsider this issue upon remand.

## VII.  Decision

For the foregoing reasons, the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the decision of the Commissioner is VACATED and the case REMANDED for further proceedings consistent with this Memorandum Opinion and Order.


IT IS SO ORDERED                           /s/ Nancy A. Vecchiarelli
                                           U.S. Magistrate Judge

Date: June 15, 2010